### SOUTHERN RY. CO. v. RAILROAD CREDIT CORPORATION.
#### No. 9364.

Circuit Court of Appeals, Fifth Circuit.
March 1, 1940.

Writ of Certiorari Denied April 29, 1940.

See 60 S.Ct. 899, 84 L.Ed. ——.

Sidney S. Alderman, General Solicitor, Southern Railway System, Henry L. Walker, Solicitor, Southern Railway System, and S. R. Prince, General Counsel, Southern Railway System, all of Washington, D. C., J. Blanc Monroe, of New Orleans, La., and Harry H. Smith, of Mobile, Ala., for appellant.

Palmer Pillans, of Mobile, Ala., and D. Willard, Jr., and Wm. J. Kane, both of Baltimore, Md., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

The decree [1] appealed from here, awarding appellee an equitable priority over appellant and enforcing it by subrogating appellee to appellant's position as First Mortgage Bondholder, was entered on appellee's intervention in the Receivership of the Mobile & Ohio Railroad Company. It was entered upon the theory first advanced by appellee in the intervention, long after its claim had been filed and allowed as unsecured and without priority, that appellee had made advances to Mobile & Ohio, relying on appellant's assurances that it would not permit M. & O. to default its obligations, and that as a result of these assurances and appellant's reliance on them, appellee had, by some kind or process of estoppel against appellant, been subrogated, to the extent necessary to pay the advances, to appellant's position as First Mortgage Bondholder. Appellant is here insisting, that upon the admitted and undisputed facts, the decree must be reversed, appellee, that it must be affirmed, both on the ground of estoppel the trial court took and upon the ground that appellant, as dominant creditor and owner of M. & O., procured and is liable for, the advances. The facts are not at all complicated, they are without dispute and may be briefly stated.

M. & O., the common debtor of appellant and appellee, is a Railroad Company, which for many years prior to June 1932, when it was placed in receivership, owned and operated a railroad from Mobile to East St. Louis. By virtue of a voluntary reorganization in 1879, the right to vote a majority of its capital stock ultimately became vested in the General Mortgage Bonds, and this right to vote a majority of the stock remained vested in those bonds up to the receivership of 1932. In 1901, Southern acquired a large majority of these bonds and of M. & O. stock, and in 1932, it owned 56,000 out of a total of 60,168 shares of the stock, and over $8,000,000 out of $9,000,000 of the General Mortgage Bonds of M. & O., which it had acquired from individual owners by exchanging its own bonds for them. Thus, from 1901 until the receivership, Southern controlled and directed the voting of the majority of M. & O.'s capital stock, the President, Vice-president and certain other officials of Southern were President, Vice-president, etc., of M. & O., and in addition, the two companies had certain directors in common. At all times, however, a majority of directors were dissociated from Southern and during all of this period, M. & O. has operated as a separate corporation and not as a part of Southern's system of railroads. It had its own operating, traffic, accounting and law departments, its own bank deposits, paid its own debts, kept separate accounts and made separate reports. It competed vigorously with Southern for traffic. Railroad Credit at all times dealt with Southern and M. &

---

[1] "It is ordered that the Railroad Credit Corporation is entitled to equitable subrogation on any money that may be found owing by the Mobile & Ohio R. R. Co., to the Southern R. R. Co. Further, out of any sum that the Southern R. R. Co., may receive from the Gulf, Mobile & Northern R. R. Co., from the sale to it of the bonds of the Mobile & Ohio R. R. Co., the said Southern R. R. Co., shall pay into the First National Bank of Mobile, subject to the order of this Court, a sum sufficient to pay the claim of the Railroad Credit Corporation against the Mobile & Ohio R. R. Co., as filed in this cause.

"Should this decree be finally affirmed said sum shall be paid to the Railroad Credit Corporation, but should this decree be finally reversed then said sum so deposited shall be returned to the Southern R. R. Co." The decree took this form because in August, 1938, Southern had arranged to sell its Mobile & Ohio Firsts to Gulf, Mobile and Northern under a plan which required their foreclosure, and it was deemed desirable while holding Southern's rights affected by the subrogation, not to interfere with the sale of the bonds and reorganization of the road.

O. as entirely separate and distinct corporations.

Appellee, Railroad Credit Company, was formed late in 1931 by the Association of Railroad Executives to receive from the carriers the emergency charges to be collected by them under the 1931 Commission Order, granting a general increase in rates on condition that the carriers should adopt some method by which the emergency charges would be pooled and made available to any carrier whose ability to pay its fixed charges was seriously endangered. The plan under which Railroad Credit was formed and placed in operation provided that it should use "the funds so provided to carry out the Commission's purpose to prevent, so far as practicable, defaults by railroad companies in their fixed interest obligations." And it further provided that if the applicant was qualified, Railroad Credit should "upon the application of any participating carrier, if the amount in the fund at the time is sufficient for the purpose, make to the applicant such loan or loans therefrom as are necessary to enable it to meet its fixed interest obligations and to avoid default thereon." While loans were forbidden to be made to any carrier able to meet its fixed obligations for its earnings through income, the plan provided that "in making loans, the corporation shall take as security the best available collateral." And that loans or advances should not be made to a carrier which, with the aid of the loan, would still be unable to meet its fixed interest obligations or to avoid default. Both Southern and M. & O. had executed a written assent to the plan and each thereby became a participating carrier and a separate corporate principal of this corporate agency of all the participating carriers.

In 1931, M. & O. failed to earn its fixed charges by over $1,730,000 and Southern failed to earn its fixed charges by $5,835,-000. On January 14, 1932, M. & O.'s Board of Directors authorized that company to apply for a loan of $1,500,000 from Railroad Credit. The application made full, complete and accurate disclosure of the existing financial condition and existing and future financial necessities of M. & O., and tendered as collateral all the securities it owned which were available therefor. Mr. Buckland, President of Railroad Credit, made a report to the Board of Directors of that company that "the collateral seems to be the best collateral which is all that is required under the plan." In the same report, calling attention to the fact that M. & O.'s application stated its "operations, accounts and financial necessities are entirely separate and apart from those of the Southern Railway Company," he suggested that "possibly the Southern might be called upon for assurance" as to M. & O.'s future. "Applicant's future is so problematical a recommendation can be made only with reluctance." "It would not be unreasonable," he said, "to expect Southern to carry applicant until funds are available." [2] The Board of Directors adopted a resolution that "further data would be required before action could be taken." At some time between January 22 and February 11, Mr. Buckland requested Mr. Harrison, the President of Southern, to obtain from his Board of Directors an expression of their policy toward M. & O. On February 11, 1932, pursuant to that request the Board of Directors of Southern by formal resolution stated their policy with reference to Southern's investment in M. & O.

"The President stated that Mobile and Ohio Railroad Company had applied to the Railroad Credit Corporation for a loan of $1,500,000 pursuant to the contract between said Corporation and the Railway companies participating in the plan for the marshalling and distribution of the revenues accruing from increases in freight rates and charges authorized in the proceeding before the Interstate Commerce Commission designated as the 'Fifteen Per Cent Case, 1931, Ex Parte No. 103' that said contract provides that 'The Railroad Credit Corporation shall make loans to enable applicants therefor to meet their fixed interest obligations and to avoid default thereon, with certain exceptions, including a prohibition that no such loans shall be made a carrier which, with the aid of the loan from the Corporation would still be unable to meet its fixed interest obligations or to avoid a default'; that in their consideration of said application, the Directors of The Railroad Credit Corporation, having before them the income account of the Mobile and Ohio Railroad Company for the year 1931 showing a deficit substantially in excess of the amount of its fixed interest obligations,

---

[2] "As previously suggested, the Southern should be required to forego payment of principal and interest on applicant's demand loans to the Southern until applicant's obligations to the Corporation have been fully discharged."

and a statement of the current and prospective cash condition indicating a deficit of cash exceeding the amount of such fixed interest obligations, has asked for an expression of the policy of the Board of Directors of Southern Railway Company with respect to its investment in the Mobile and Ohio Railroad Company.

"On Motion, duly seconded, it was resolved, that the policy of Southern Railway Company is to protect its investment in the Mobile and Ohio Railroad Company, and to that end, it is the sense of this Board that in the event the Mobile and Ohio Railroad Company, in order to meet its fixed interest obligations and to avoid default thereon during the period to May 31, 1933, shall require financial assistance in addition to such loan or loans as may be made to it by The Railroad Credit Corporation, such assistance should be extended by Southern Railway Company so far as can be done, in the discretion of this Board, with due regard to this Company's other financial requirements and obligations; provided that this resolution, while declaratory of the policy of this Board, shall not be interpreted as imposing upon Southern Railway Company any contractual liability to the Railroad Credit Corporation or to any other person or corporation."

A copy of this resolution was sent to and read by the President of Railroad Credit to his Board, and that company adopted a resolution setting Southern's resolution out in extenso and authorizing a loan of $786,-048.

We now come to the only real dispute in the case. It arises not over whether the testimony is overborne, by opposing contradictions, for no witness contradicts another, but over whether, (a) Buckland's testimony of Harrison's statement to him, given after Harrison's death, and therefore not contradicted, was admissible, because varying from the pleadings, (b) if admissible, was true, and (c) if admissible and true, was of a material bearing or effect on appellee's claim against appellant. Claiming that his real reliance was on personal assurances given him by Mr. Harrison, the President of Southern, Buckland testified: "Mr. Harrison said to me—'The Southern Railway Company will not permit the Mobile & Ohio Railroad Company to default its obligations' * * * and I said to Mr. Harrison—'Your Honor, I am not trying to quote word for word, but I am trying to give you the substance of it'—'I believe you

—I rely upon you—but you and I may not be here in two or three months—we may be both gone—and it seems to me that we ought to put in more permanent form—there ought to be some action by your Board." And the resolution of the Board followed,—the next morning.

"Q. The resolution of the—the resolution you refer to is the resolution of the Board of Directors of the Southern Railway Company of February 11th? A. Yes Sir; which I submitted to my Board on February 17th, together with relating the conference which I had had with Mr. Harrison."

As further emphasizing the significance of this conversation and appellee's reliance on it, Buckland refers to conversations and correspondence between him and Mr. Prince, general counsel for Southern and for M. & O., with regard to the surrender to Southern, when Railroad Credit should take over the bonds, of the $1,000,000 of its bonds, it had put up with Reconstruction Finance Corporation, to secure a temporary loan for M. & O., until Railroad Credit should be in funds. Both Railroad Credit and Southern agree that it was the agreement and understanding that the bonds should be released, but Railroad Credit claims that the agreement releasing the bonds was made by the company on the reliance of Mr. Buckland on the personal assurance that Mr. Harrison had given him, while Southern claims that the reliance was on the resolution Southern had passed. As further supporting its view, appellee points to this paragraph in Prince's letter: "In accordance with your request, I delivered to Mr. Harrison your message, that he might have your assurance (that Railroad Credit would not require the $1,000,000 Southern Railway Bonds) in as much as you had accepted his assurance with reference to the Southern Railroad's intention in regard to the Mobile and Ohio. To this he agreed."

Appellant points to Prince's testimony and to Buckland's letter to Prince, as showing exactly the contrary. This letter reads: "Acknowledging your letter of the 24th * * * In addition to the collateral and pledge of the amounts due or to become due to Mobile and Ohio in distribution, there was also a resolution of the Southern Railway Company, expressing its intention with regard to the Mobile and Ohio. The collateral which you mentioned in your letter, $1,000,000 Southern Railway Development and General Mortgage 4% Bonds of

1956, is not among the collateral mentioned in the resolution. I see no occasion for changing the requirements of the resolution to include that collateral or to ask for other security and I so advised you in the telephone conversation mentioned in your letter."

All parties interested in the advance to M. & O. knew that it was only a tideover. M. & O. had asked for $1,500,000. Railroad Credit had advanced it only one-half of that sum to meet its maturing fixed obligations and everyone knew that M. & O. had a great deal more financing to do. Appellee does not and could not contend that the default which followed was due to bad faith on the part of either M. & O. or Southern. On the contrary, the depression continuing in severe and severer form, both M. & O. and Southern made strenuous but unavailing efforts to enable M. & O. to carry on. Keeping in mind that Southern's resolution was passed in connection with an application to Railroad Credit for $1,500,000; that it stated Southern's policy to be that "in the event the Mobile & Ohio R. R. Company, in order to meet its fixed interest obligations and to avoid default thereon, during the period to May 31, 1933, shall require financial assistance, in addition to such loan or loans as may be made to it by the Railroad Credit Corporation, such assistance should be extended by Southern so far as can be done in the discretion of the Board with due regard to the company's other financial requirements and obligations;" that Railroad Credit loaned only one-half the amount applied for, and that Southern was itself in grave financial straits, its own borrowings being $7,500,000 in February, another $7,000,000 in August, 1932, from Reconstruction Finance Corporation, and $2,-000,000 in October from Railroad Credit, all other sources of Railroad Credit having completely dried up; the failure of Southern and M. & O. to keep M. & O. going is plainly seen to be the natural and inevitable result of the general financial stringency and paralysis. For, Southern did not leave M. & O. unaided to struggle for credit. It vigorously supported M. & O.'s application made in April to the R. F. C. for $1,000,000 by lending for use as collateral $2,000,000 of Southern's bonds, but without avail. R. F. C. insisted on $3,000,-000 of the bonds and Southern, in view of its own financial stringency and imperative borrowing needs, was compelled to refuse to involve itself so greatly. Unable to get money from Railroad Credit or Reconstruction Finance Corporation and unable to continue without it, M. & O. had no recourse but receivership.

Admitting that considered abstractly as theories, and apart from their application to the facts of this case, appellee's theories of estoppel and dominant relationship are very pretty ones, appellant insists that they are completely wide of the mark here. Admitting that persons may be and often have been held estopped by conduct and statements, from later taking a contrary position, and that while normally, statements and assurances to estop must be of fact and not mere future promises, there may be conditions under which a statement promissory in form is in effect, an assurance of a present relinquishment of a right, sufficient to estop, it insists that the record here is wholly devoid of any such statement. Admitting, too, that where a person in a dominant creditor or ownership relation to another induces one to contract with or serve that other by deceptive or equivocal conduct, he will be prevented from taking advantage of his position against the other so misled, appellant insists that that theory of recovery has no place here. For (a) the loan was made to M. & O. pursuant to the policy or plan Railroad Credit was formed to serve; (b) it was made to M. & O. as separate and distinct from Southern; and (c) Southern's part in its procuring and its obligations, or rather lack of obligations on account of it were set down in a precise and definite statement of its policy toward M. & O., coupled with definite and specific statements, that if the loan should be made, Southern must not be looked to at all for payment.

Turning from appellee's theories to the record, appellant makes three points against the decree. The first is, that it cannot stand on the resolution of Southern's Board, for the resolution not only contained no such assurance as that relied on to support the decree, but its carefully worded terms completely negatived such assurance; the second is, that it cannot stand on Harrison's oral assurance to Buckland because, (a) Buckland's testimony as to this is at variance with plaintiff's pleadings which alleged, not that Harrison gave him assurance, but that Prince gave it for Harrison; (b) that tested by the writings and the testimony as a whole, and especially by Buckland's failure to give his testimony until

after Harrison's death, his statement as to that assurance may not be taken as true; and (c) because if admissible and taken as true, it was without significance, for, in the conversation as testified to, Buckland declined to take Harrison's assurance, insisting on an assurance from the company, and that assurance was later given, merging into it all prior negotiations and conferences. And finally, because if contrary to the whole record, it be assumed that the advance was made not in reliance upon Southern's resolution, but upon Harrison's statement, the statement will not support the decree. For, taking the purported assurance at its fullest in favor of appellee, it said no more than that Southern would not permit M. & O. to default its obligations and no fraud or wrongful intent or conduct being claimed or shown, the most that could be made out of the assurance would be to give appellee a claim for damages for any loss caused by its breach. But no damages from its breach are claimed or shown, nor indeed could be. The receivership was a protective one, not a mortgage foreclosure, and under it the Mobile & Ohio went forward with its business without interruption. There is no showing that Railroad Credit would have been paid if Southern had advanced money to pay the mortgage interest. The mortgage interest was not paid out of current earnings to which Railroad Credit was looking for payment. It was not paid at all. Absent some showing that if the default had not occurred, Railroad Credit would have gotten its money, it is without standing to make any claim here against Southern on the basis of Harrison's assurances. But, what is claimed here is not that Railroad Credit's unsecured claims would have been any less unsecured had the default not occurred until May, 1933, what is claimed is, and this is directly contrary to the provisions of the resolution, that because of Harrison's assurance and its reliance, Southern's position as First Mortgage Holder has become subordinated to Railroad Credit's unsecured loan. And this is the more remarkable because the most that Buckland ever thought of asking as shown by his reports during the negotiations was that Southern would not ask interest on or payment of its open unsecured account until Railroad Credit was repaid. But even that was not agreed upon, Southern making it clear in its resolution that it would not in any wise become responsible or liable for the non-payment of the claim.

While we do not agree with appellant that Buckland's testimony as to Harrison's assurance should have been excluded for variance, we do agree with it that it will not support the decree, both because, (1) it would furnish no basis whatever for the claim of estoppel and subrogation to Southern's First Mortgage position, but at most only a claim for damages, and (2) it is perfectly plain from Buckland's testimony and the record as a whole that Harrison's assurance was only a preliminary to and was merged in the resolution. We agree with appellant, too, that the record furnishes no basis whatever for the decree. We need not discuss the authorities that appellee relies on in support of its theories, for the facts of this case do not bring it remotely within the most extreme of them. Here was no self-serving, deceptive or equivocal conduct or statement by Southern in its dominant position to induce Railroad Credit to make the advance for Southern's benefit, and in reliance upon Southern's seeing that the advance would be paid. The advance was made by Railroad Credit not as an accommodation to Southern, but pursuant to the plan of its creation, to extend aid to railroads in distress and Southern was so far from misleading Railroad Credit into looking to it to pay the loan that its assurance, while stating its policy to help M. & O., if it could, precisely and unequivocally stated that this policy would be followed only to the extent that it was to the interest of Southern to do it, and that in no event would Southern be liable for the loan. Nor does appellee stand any better on its theory of subrogation by estoppel. Here was a loan to a needy railroad made by a corporation formed for the purpose of making such loans. It was made upon a definite statement of Southern's policy, a policy adhered to until adverse conditions made adherence impossible, and an equally definite statement that Southern was on no account to be held liable or looked to on account of the loan. To read Southern's resolution as creating an estoppel, to collect upon its First Mortgage Bonds until Railroad Credit's unsecured claim was first paid and on this estoppel to base a subrogation of Railroad Credit to Southern's position as a First Mortgage Bondholder, does violence not only to the plain language of the resolution but to the truth and justice of the case.

Plaintiff's claim is wholly wanting in equity. The decree was wrong. It is re-

versed with directions to dismiss the intervention.

Reversed.